```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA       :
                               :        24 Cr. 537 (LJL)
        - against -            :
                               :
BRIAN CORDASCO,                :
                               :
                Defendant.     :
------------------------------X
```

## SENTENCING MEMORANDUM

**David Stern**
Rothman, Schneider,
  Soloway & Stern, LLP
100 Lafayette Street, Ste 501
New York, New York 10013
(212) 571-5500

## ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN
JEREMY SCHNEIDER
ROBERT A. SOLOWAY
DAVID STERN

Tel: (212) 571-5500
Fax: (212) 571-5507

RACHEL PERILLO

March 17, 2025

<u>VIA ECF</u>
Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: United States v. Brian Cordasco,
         <u>Case No. 24-CR-537 (LJL)</u>

Dear Judge Liman:

  We represent Brian Cordasco, who is scheduled for sentencing before your Honor on March 31, 2025 following his plea of guilty to Count 1 of the Indictment herein, which charged him with conspiring to solicit and receive a bribe in violation of 18 U.S.C. §666(a)(1)(B). As detailed below, we respectfully request that your Honor sentence Brian to one year of home confinement and 1000 hours of community service.

## Introduction

  Brian Cordasco, while a member of the FDNY's Bureau of Fire Prevention, accepted payoffs totaling $57,000 over the course of approximately two years in return for expediting early fire alarm plan reviews and inspections for entities seeking permits to open businesses in New York City. Significantly, the FDNY performed all of the inspections for which Brian accepted bribes, meaning that his actions did not cause the FDNY to accept flawed fire alarm plans or to cause properties to pass inspection notwithstanding faulty fire alarm systems. Put differently, the payoffs that Brian accepted to expedite FDNY fire alarm plan reviews and inspections did not compromise the FDNY's ability to ensure that the properties it inspected satisfied all applicable safety guidelines. Thus, the public was never put in any danger because of Brian's criminal conduct.

  Brian understands and very much appreciates that he has no one other than himself to blame for his wrongful conduct, for which he

2

is both deeply remorseful and ashamed. Indeed, Brian admitted his guilt and accepted full responsibility for what he did within three weeks of his arrest. As detailed in the letters submitted herewith, Brian is deeply remorseful for his actions, and he makes no excuse for what he did. Rather, he struggles to understand why, after living an honest and honorable life as a family man, community leader and 22-year veteran FDNY firefighter, he succumbed to greed and accepted bribes. Indeed, Brian's conduct herein is wholly inconsistent with his character as reported by those who know and love him and an aberration from his otherwise honorable two-plus decade career saving lives and helping others do so.

While there is no justification for his actions, and nothing in this submission or submitted herewith should be deemed an attempt at diminishing or detracting from the seriousness of his offenses, weighing the good Brian has done in his life against the crime he committed counsels in favor of a lenient sentence. In light of the factors discussed herein, as well as comments to be made at the time of sentencing, it is respectfully submitted that this Court should sentence Brian to one year of home confinement and 1000 hours of community service – a sentence that we submit would be sufficient but not greater than necessary to promote the statutory goals and purposes of criminal sentencing provided for by 18 U.S.C. § 3553(a).

## SENTENCING PROCEDURES AND STANDARDS

In *United States v. Booker*, 543 U.S. 220 (2005) the U.S. Supreme Court found that mandatory application of the Guidelines was unconstitutional and, as a remedial measure, excised 18 U.S.C. § 3553(b) from the Sentencing Reform Act of 1984. Thus, since *Booker*, sentencing in federal court has been governed entirely by 18 U.S.C. § 3553(a), pursuant to which the Guidelines are advisory only. District courts therefore must now consider all the 18 U.S.C. § 3553(a) sentencing factors in determining and imposing sentences that are "sufficient, but not greater than necessary" to achieve the penological objectives of the criminal justice system. *Booker*, 543 U.S. at 245-46. *See also Nelson v. United States,* 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable") (italics in original); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("the Guidelines are no longer mandatory" and, thus, "sentencing judge[s] must consider the Guidelines and all of the other factors listed in section 3553(a)").

This Court therefore is authorized and empowered to consider its "own sense of what is a fair and just sentence under all the

3

circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). *See also United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (district courts "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range"). Indeed, this Court "need not accept the Sentencing Commission's penological framework. [It] may adopt its own." *Bartlett*, 567 F.3d at 908. *See also Gall v. United States*, 552 U.S. 38, 50 & n.7 (2007) (courts must "make an individualized assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant'").

Simply put, once the Guidelines range is calculated, "sentencing becomes a judgment call for the court." *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008).

### Mr. Cordasco's Presentence Report and Advisory Guidelines Offense Level

Brian and I have reviewed the Presentence Report ("PSR"), dated December 10, 2024. We have no objections to the information or Guidelines offense level calculation therein.

### Mr. Cordasco's Personal History and Family Circumstances

Brian, age 50, is consumed by guilt, remorse and regret for the crime he committed and the impact it has had on the FDNY, to which he dedicated his life. Notwithstanding his actions, the FDNY still holds a special place in his heart, alongside his parents, wife and children, who are the center of his life. Photographs of Brian with his family are attached as Exhibit A. He is humiliated by the crimes he committed and for the pain and shame he has visited on his loved ones.

### Mr. Cordasco's Work History

After a happy and stable childhood, Brian attended Fairfield University, graduating in 1996 with a degree in marketing. After graduation he worked as a recruiter for a number of private companies. He did not find the work satisfying or fulfilling. With the objective of finding more meaningful work and because he wanted to serve the community, Brian, following in the footsteps of his father, Vincent, who served as an FDNY chief, joined the FDNY. Soon after doing so, he was assigned to assist in the dangerous work of cleaning-up of the World Trade Center site after the 9/11 terror attacks. Brian then continued his work for

4

the FDNY for the next 22 years, initially serving as a firefighter and then, through hard work and dedication to his profession, eventually earning the rank of Chief Officer in 2016. As reflected in the letters from his co-workers, Brian faced the challenges and dangers that are inherent in the work of any firefighter with courage and skill. By way of example only, the PSR describes how Brian "delivered several babies, saved people, pets, and structures from fires, resuscitated numerous individuals, and was part of the World Trade Center cleanup effort after 9/11." (PSR ¶86) In 2024, following his arrest and conviction herein, Brian left the FDNY in disgrace. Even today he does not fully understand why he accepted the payoffs for which he pled guilty.

### Mr. Cordasco's Health

Although he is generally in good health, Brian does suffer from a few serious medical conditions, a number of which arise from his work cleaning the World Trade Center site after the 9/11 terror attacks. Those medical issues may pose future risks to his health and well-being. Indeed, the conditions from which he suffers are potentially serious and therefore require regular monitoring, a practice that normally does not occur for those in BOP custody.

For example, Brian suffers from a left bundle branch block in his heart. Bundle branch block is a condition in which the electrical signals that control the heartbeat are delayed or blocked in either the right or left bundle branch of the heart. These branches carry electrical impulses from the heart's pacemaker to the ventricles (lower chambers of the heart). As described in the letter from Dr. John J. Nobile, Brian's bundle branch block should be evaluated every 3-6 months. This is unlikely to happen in B.O.P. custody.

Brian also suffers from nodules on his left thyroid –findings that are also regularly monitored because, as reflected in the clinical notes of Dr. Kepal N. Patel from September 23, 2024 in which he opines that there is a 50% chance of malignancy. Also, Brian suffers from sinusitis and sleep apnea, both of which, along with his thyroid issues, have been certified by the World Trade Center Health Program as potentially having been caused by his work cleaning the World Trade Center site after the 9/11 terror attacks. He therefore receives annual physicals for purposes of early detection of World Trade Center-related disorders. Brian's medical records are attached collectively as Exhibit B.

5

## Mr. Cordasco's Post-Offense Conduct

Brian sought to plead guilty and accept responsibility for his criminal conduct immediately upon retaining counsel. Indeed, he has never made excuses for his conduct and admitted his guilt as promptly as he could. Also, as the government knows, Brian promptly offered to repay the $57,000 representing the ill-gotten gains from his criminal conduct. He remains ready and willing to do so as soon as the government instructs him on how to make that payment.

Perhaps the most difficult part of this entire experience for Brian was telling his family and friends what he had done. In the immediate aftermath of his arrest those who knew him best could not, and would not, believe that he had engaged in criminal conduct. Brian could have played along to save face. But he did not. Instead, he sat down with those he loves most, his parents, his siblings, his wife and his 13 year old son Vincent, and told them that he had, in fact, done what he had been accused of doing. (Brian has not yet told his 9 year old daughter about his crimes because he believes it would be too difficult for her to comprehend and process at this time.) Rather than withdrawing from his family and friends, Brian decided to make the best of a bad situation by using his wrongful conduct as a teaching lesson for his son. In describing how his father told him what he had done Vincent says;

> My dad and mom sat me down and explained everything to me that is going on. He always teaches me and my sister that honesty is the best policy. I love my dad and hope that you see that he is a really good man who loves us very much. I know that my dad would sacrifice anything to make sure we are safe and healthy.

He has told his family and friends that whatever price he pays he knows that it is entirely his doing. His wife Kerry Anne writes;

> My hope is that you take into consideration the whole man that is presented before you. He made a mistake and I wholeheartedly believe that he would never make any decisions that would put our family in jeopardy. The full picture was obviously not clear but one thing is for sure, no one will be harder on him than himself.

Brian was also a role model to his brothers who were shocked when they found out what Brian had done. His brother, Michael, writes;

6

> When the charges were initially released about my brother
> Brian, I was in disbelief — I thought there had to be some
> mistake. I was very saddened to learn that Brian engaged
> in the activities contained in the allegations. However,
> it is my hope that you take this letter into consideration
> at the time of Brian's sentencing, as I have not changed
> my opinion of his strong character.

Finally, Brian's parents, Vincent and Patricia Cordasco, write;

> We all are disappointed and saddened by the business
> decision that has led to this situation, as it is out of
> character for him. We want you to know that we support
> Brian and will always stand by him.

Brian's family letters are attached as Exhibit C. *See United States v. Alatsas*, Case No. 06-CR-473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing non-Guidelines sentence of three years probation on a defendant convicted of conspiracy to commit loan application fraud notwithstanding a Guidelines range of 24-30 months imprisonment based, in part, on a finding that "[s]pecific deterrence is provided by the shame created by the felony conviction").

### Mr. Cordasco's Character as Reported by His Family and Friends

One measure of a person's life is the way their family, friends and co-workers support them when they are at their lowest point. By that measure Brian has lived a very good life. Before engaging in the conduct for which he pled guilty, Brian was an exemplary firefighter, moving up in the FDNY ranks and showing great care for the men under him as well as the well-being of the citizens of New York. Attached collectively as Exhibit D are letters from men who worked with Brian over the past two-plus decades. For example, James Hughes III, who has known him for more than 13 years, writes that Brian;

> …never hesitated to put his own life on the line to protect
> his fellow firefighters and the people in the community he so
> bravely served".

Likewise, Anthony Arpaia, a 28-year Fire Department Deputy chief who has known Brian since high school, writes;

7

> Brian was always known to be honest, trustworthy, and readily
> relied on. I am unsure of all of the complexities of Brian's
> case, but I do believe that Brian will grow from any mistakes
> that might have been made.

And, David Vega, who has known Brian as a firefighter for nineteen years, writes;

> …Brian is, without a doubt, one of the greatest men I have
> had the privilege to meet and call a friend. I understand
> the seriousness of the circumstances surrounding the current
> situation, but this has not changed my opinion of him, nor
> has it diminished my admiration.

Others write in the letters that are attached of Brian's preparedness and kindness, including the support, guidance and study assistance he provided to other firefighters looking to advance their own FDNY careers like Brian did. Finally, nearly every person who knows Brian professionally notes his devotion to and the importance of his family. These letters demonstrate that Brian's criminal conduct is aberrational and unlike the way he has lived his life.

    Both old and new friends have written letters on Brian's behalf. Letters from his friends are attached collectively as Exhibit E. Among others, Paul Bourke and Thomas Venito, who have known him for decades, both describe Brian as a loving and honorable friend. Mr. Venito relates how whenever he met firefighters who knew Brian they would say "Oh, you know Brian, what a great Guy." And Paul Bourke describes the Brian he knows as "a kind, honest, responsible and a very trustworthy individual. He lives his life to the fullest each day always making the right decision, caring for and looking to help others along the way, placing their happiness ahead of his." Brian also has a newer group of friends whom he met in the last several years through his daughter's interest in cheerleading. In the letters attached collectively as Exhibit F, these newer friends describe the Brian they know. All of them describe Brian's character, his love and care for his own children, and his willingness to help others in any way he can. As Melissa Cohen, a New York City Public School teacher, writes;

> I see firsthand every day what not having a parent around
> does to a child. Brian is a strong support system for his
> wife Kerry and his children Vincent and Emily. He helps them
> with homework, attends football practices and games, cheer
> competitions, musical performances, and is always so

supportive and motivating of all the children, not just his own.

     Finally, members of Brian's family made clear in their letters of support that Brian is an irreplaceable part of the family without whom they will all suffer. Of course families always lose a loved one if such a family member is incarcerated. But the letters from Brian's family demonstrate that he is, more than many, an integral member of the family, the bond and glue that keeps his family together. For example, his son, Vincent, describes how his father has guided him throughout life and expresses how much he needs Brian as he prepares to graduate from middle school. His wife Kerry Anne wrote about the outsized role Brian plays in the life of their family. And Brian's parents describe their pride in having him for a son. Also, Brian's siblings, who may know him best, describe Brian's deep sense of regret and remorse, particularly given the otherwise positive life he has lived.

### Mr. Cordasco's Charitable Work

     Brian has been involved in charitable work throughout his life. For the past four years Brian has served as an adviser to Susan Starr, who is the Senior Director of the Tunnels to Towers Foundation.[1] Ms. Starr writes of the importance of the help Brian has provided and the kindness and compassion he has displayed while doing so. More recently, Brian has found additional outlets for his energy and concern for the community. He began working for Meals on Wheels of Staten Island[2] and, in his short tenure, has distinguished himself as described in the letter from Toni Arcamone, which is attached as Exhibit G. Brian has also found work as a recruiter finding potential employees for Elefterakis, Elefterakis & Panek, a personal injury firm in Manhattan.[3] (A copy of his contract is attached as Exhibit H.) Finally, as described in the attached letter from Brian, Exhibit I, he deeply remorseful and has learned a difficult and painful lesson from his actions. Whatever the sentence he will never again be involved in illegal activity.[4]

---

[1]    See https://t2t.org/ (last visited Mar. 17, 2025.)

[2]    See https://mealsonwheelsofstatenisland.com/) (last visited Mar. 17, 2025).

[3]    See https://eeplaw.com/ (last visited Mar. 17, 2025).

[4]    See United States v. Morales, Case No. 09-CR-617 (JBW), 2010 WL 3781017 (E.D.N.Y. Sept. 21, 2020) (imposing a non-custodial sentence after finding that "[d]efendant appears to be contrite

## Conclusion

Brian is a good man who did bad things, not a bad man who did bad things. He is regretful, remorseful and accepts full responsibility for his criminal conduct. Because he has resigned from the FDNY, he poses no threat to any individual or the community at large. *See United States v. Butler*, 254 F.R.D. 37, 40 (E.D.N.Y. 2010) (imposing non-Guidelines sentence in part because defendant's "loss of his securities license, probably his ability to work in the financial sector, and the impact of this conviction on his employability" combined with the conclusion that it "is unlikely he will engage in further criminal activity in light of his continuing supervision, the need to provide for his wife and young son, and the support of his family and many friends and associates"). Indeed, he has long served, not threatened, the community.

Simply put, "no right-minded observer would regard" a sentence of home confinement "under these circumstances as a windfall." *United States v. Mongelli*, Case No. 02-CR-307 (NGG), 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020). Rather, a sentence of home confinement would be the "right result" for the "right defendant" under the "right circumstances" and for the "right reasons." No prison term is necessary to accomplish the 18 U.S.C. § 3553(a) sentencing objectives that a term of home confinement could equally accomplish. It would account for the crimes he committed, the need for punishment and deterrence, while also

---

and has demonstrated that she understands the seriousness of the crime. Defendant comes from a stable matriarchal family and has support from her extended family. She has educated herself despite coming from deprived circumstances"); *United States v. Gayle*, Case No. 09-CR-35S (JBW), 2010 WL 2540488 (E.D.N.Y. June 17, 2010) (imposing a non-custodial sentence in part because defendant's "family relationships are strong, and she has been a model to many people. . . . She is the primary source of support, both financial and psychological, for her young child"); *United States v. Chang Miao Ye*, Case No. 09-CR-184 (JBW), 2010 WL 447374 (E.D.N.Y. Jan. 22, 2010) (imposing a non-Guidelines sentence where "defendant has demonstrated a strong work ethic and a commitment to supporting his family"); *United States v. Guzman*, Case No. 08-CR-332 (JBW), 2009 WL 1617942 (E.D.N.Y. June 2, 2009) (imposing a non-Guidelines sentence where defendant "appears to be contrite and has close family relationships"); *United States v. Singh*, Case No. 08-CR-868 (JBW), 2009 WL 4626645 (E.D.N.Y. Dec. 7, 2009) (imposing a non-Guidelines sentence where defendant "is a hardworking man who helped support his family and has otherwise led a lawful life").

considering his contributions to society and the otherwise honorable life he has lived. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (if this Court "conclude[s] that two sentences" – one consistent with the Guidelines and one below the Guidelines – "equally serve[] the statutory purposes of § 3553(a), it [cannot], consistent with the parsimony clause, impose the higher" sentence). Simply put, a term of home confinement would both fit the crime that Brian committed and reflect the man he has been for virtually his entire life.

Accordingly and for the foregoing reasons, we respectfully request that this Court sentence Brian to one year home confinement and 1000 hours of community service.[5]

Thank you for your consideration and attention to this matter.

Respectfully submitted,

*David Stern*

David Stern
Rothman, Schneider,
    Soloway & Stern
100 Lafayette Street
Suite 501
New York, NY 10013
T. 212-571-5500
F. 212-571-5507
dstern@rssslaw.com

*Attorney for Defendant
Brian Cordasco*

---

[5] Should your Honor sentence him to a term of imprisonment, we respectfully request that your Honor recommend to the BOP that it designate Brian to FORT DIX so that he can be near his family on Staten Island. Also, should your Honor sentence Brian to a term of imprisonment, we respectfully request that your Honor direct that Brian be permitted to self-surrender to the BOP facility to which he is designated.